UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------- x
                                   :
JOSE DAVID CHICA-HERNANDEZ,        :
                                   :
                  Plaintiff,       :
                                   :          **MEMORANDUM AND ORDER**
     -against-                     :
                                   :          No. 17-cv-6422 (KAM)(VMS)
ITALPRESSE U.S.A., INC. AND        :
ITALPRESSE S.P.A.,                 :
                                   x
                  Defendants.

--------------------------------

**MATSUMOTO, United States District Judge:**

Plaintiff Jose David Chica-Hernandez brought this diversity action against Defendants Italpresse U.S.A., Inc. ("IUSA") and Italpresse S.P.A. ("ISPA"), alleging negligence, strict products liability, and breach of warranty claims. (ECF No. 1, Complaint ("Compl.").) Upon the close of discovery, Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and to exclude testimony by Plaintiff's expert, Dr. Irving Ojalvo. (ECF Nos. 79, Notice of ISPA's Motion for Summary Judgment; 84, Notice of IUSA's Motion for Summary Judgment.) For the reasons set forth below, Defendants' motions to exclude Dr. Ojalvo's testimony are denied. Defendants' motions for summary judgment are granted as to Plaintiff's manufacturing defect and breach of warranty claims, which are dismissed. Defendants' motions for summary judgment are

1

denied as to Plaintiff's design defect and failure to warn claims. IUSA's motion for summary judgment on its cross claim against ISPA for indemnification is denied without prejudice.

## BACKGROUND

The Court has considered the facts set forth below from the parties' declarations and exhibits attached thereto, and the Rule 56.1 Statements of Facts and opposing 56.1 Statements.[1] Upon consideration of the motions for summary judgment, the Court must and will construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). Unless otherwise noted, the following facts are undisputed, or the opposing party has not proffered evidence in the record to dispute them.

## I.  Factual Background

Plaintiff suffered an injury to his left hand on November 4, 2014, during the course of his employment at non-party Island Architectural Woodworking Inc. ("IAWW") when his left hand came

---

[1] (*See* ECF Nos. 80, ISPA's 56.1 Statement ("ISPA 56.1"); 81–81-13, Park Declaration in Support of ISPA's 56.1 Statement ("Park Decl.") and exhibits attached thereto; 86, IUSA's 56.1 Statement ("IUSA 56.1"); 88–88-17, Van Etten Declaration in Support of IUSA's Motion for Summary Judgment and 56.1 Statement ("Van Etten Decl.") and exhibits attached thereto; 89–89-41, Massaro Declaration ("Massaro Decl.") and exhibits attached thereto; 90, Plaintiff's Response to ISPA's 56.1 Statement ("Pl. Resp. ISPA 56.1"); 92, Plaintiff's Response to IUSA's 56.1 Statement ("Pl. Resp. IUSA 56.1"); 94-1–94-10, Exhibits to ISPA's Reply Memorandum in Support of its Motion for Summary Judgment; 94-12, ISPA's Reply to Plaintiff's 56.1 Statement of Additional Facts ("ISPA 56.1 Reply").)

into contact with a nip point[2] of the rollers of a glue spreader component (the "Glue Spreader") of a 2011 Italpresse Mark/C 16-32/10 Automatic Pressing Line (the "Pressing Line"), manufactured by ISPA and sold to IAWW by ISPA's subsidiary, IUSA. (ISPA 56.1 ¶ 1; IUSA 56.1 ¶¶ 5—6.) The Glue Spreader component of the Pressing Line was manufactured by a non-party entity, Osama Technologies, and sold to ISPA. (IUSA 56.1 ¶ 99.) IUSA sold and delivered the Pressing Line to IAWW in May 2011. (*Id.* ¶ 6.) Plaintiff commenced this action against Defendants, alleging design defect, manufacturing defect, and failure to warn, under negligence and strict products liability theories, and breach of warranty claims. (ECF No. 13, Amended Verified Complaint.)

Defendants' Pressing Line is a machine that presses together the faces of laminate and veneer paneling onto substrates such as wood or foam board. (ISPA 56.1 ¶ 3; IUSA 56.1 ¶ 7.) The Pressing Line consists of several components, including the Glue Spreader, which has multiple rollers (or rotation cylinders) that apply glue to the substrate. (*Id.*) The substrate is inserted through the infeed side, or the front, and, once glue is applied, the substrate exits from the outfeed side, or the back, of the Glue Spreader. (IUSA 56.1 ¶ 8.) The rollers on the outfeed side rotate in opposite directions. (*Id.*)

---

[2] "A nip point is where two surfaces come into contact, creating a point where an object can become caught or be pinched off." *Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 326 (E.D.N.Y. 2002).

The Glue Spreader was equipped with the following safety features that block access to and/or stop the operation of its rollers: (1) a blue mesh guard located in the front (or infeed side), which stops the rollers when lifted up; (2) a blue mesh guard located in the back (or outfeed side), which stops the rollers when lifted up; (3) a red emergency button that, when pressed, stops the Glue Spreader; (4) a blue safety bar at knee height in the front (or infeed side) which stops the rollers when pressed; (5) a blue safety bar at knee height in the back (or outfeed side) which stops the rollers when pressed; and (6) a silver metal guard/grill positioned vertically in the back (or outfeed side), which completely blocks access to the rollers. (ISPA 56.1 ¶ 9; Pl. Resp. IUSA 56.1 ¶¶ 9–10.) Electrical limit switches[3] integrated into the machine's control system functioned as an interlock control for the guards, (ECF No. 89-9, Exhibit 9 to Massaro Decl. ("Schwalje Dep. Tr."), at 26:17–21), such that opening the guards would interrupt the electrical switches, causing the rollers to immediately stop operating. (*Id.* at 29:16–22.)

In May 2011, when the Pressing Line, including the Glue Spreader, was delivered to IAWW by IUSA, there were several warning signs affixed to the Glue Spreader, both in writing and pictograms,

---

[3] The Court notes that the terms "limit switch" and "interlock" are used interchangeably in the parties' submissions.

indicating the danger of nip points of the rollers.  (ECF No. 88-16, Exhibit H to IUSA's Responses to Plaintiff's First Set of Interrogatories, at 12–17.)[4]  One of the signs stated: "DANGER. Pinch point.  Crush hazard.  Keep clear of rollers.  Follow lockout procedure before servicing."  (*Id.* at 16.)  Another sign stated: "WARNING.  READ AND UNDERSTAND WELL THE INSTRUCTION MANUAL BEFORE THE MACHINE RUNS.  STOP THE MACHINE IF YOU HAVE TO BRING YOUR HANDS NEAR TO [sic] THE CYLINDERS.  KEEP ALL SAFETY DEVICES TO POSITION WHILST THE MACHINES RUNS [sic].  DON'T USE FREE CLOTHES IF YOU ARE NEAR TO [sic] A RUNNING MACHINE."  (*Id.* at 17.)  The warning signs included at least four pictograms, three of which depict a person's hand or arm being caught between rollers.  (*Id.* at 15–17.)

These warning signs were affixed to the Glue Spreader when IUSA trained IAWW employees when IAWW first purchased the Glue Spreader, (Pl. Resp. ISPA 56.1 ¶ 188), but the record does not establish whether all the signs were present at the time of Plaintiff's accident in November 2014.  And the parties' expert reports suggest that the sign that cautioned users to review the instruction manual before running the Glue Spreader, stop the machine before putting their hands near the rollers, ensure that all safety devices are in position while the machine runs, and not place any loose clothing near the machine while it runs, was only

---

[4] The Court refers to the Electronic Case Filing ("ECF") System's pagination for this specific document for ease of reference.

in Italian when the experts inspected the Glue Spreader in 2017 and 2018. (ECF Nos. 89-28, Exhibit 28 to Massaro Decl. ("Ojalvo Suppl. Expert Report"), at 13; 89-22, Exhibit 22 to Massaro Decl. ("Brickman Expert Report"), at 28); 89-30, Exhibit 30 to Massaro Decl. ("Auflick Suppl. Expert Report"), at 11.)

At the time of receipt of the Pressing Line in May 2011, IAWW was provided with two user manuals, one for the Pressing Line, and a separate manual for the Glue Spreader. (ISPA 56.1 ¶ 5; IUSA 56.1 ¶ 15.)[5]  The manuals were in English and Italian. (ECF No. 89-4, Exhibit 4 to Massaro Exhibit ("Ortmayer Dep. Tr."), at 38:19–39:18.)  It is undisputed that Plaintiff reads and understands little English, (Pl. Resp. ISPA 56.1 ¶ 193), and does not speak Italian. (ECF No. 89-7, Exhibit 7 to Massaro Decl. ("Pl. Dep. Tr."), at 8:4–6.)

---

[5] Plaintiff fails to demonstrate that there is a material factual dispute as to whether IAWW was provided with two user manuals, one for the Pressing Line and another for the Glue Spreader.  During his deposition, Alberto Salsa, the corporate representative of ISPA, testified that there was a separate manual for the Glue Spreader. (*See* ECF No. 89-1, Exhibit 1 to Massaro Decl. ("Salsa Dep. Tr."), at 22:5–16 (Q. In 2014 and before that, was there a specific manual or instruction manual or operator's manual for the glue spreading machine specifically? A. Yes.).)  The portion of Salsa's deposition testimony to which Plaintiff cites in "disput[ing]" that the machine was provided with two manuals," (Pl. Rep. ISPA 56.1 ¶ 5; Pl. Resp. IUSA 56.1 ¶ 15), relates to Salsa not being aware that there were separate instructions for cleaning the Glue Spreader in the Glue Spreader manual, not that there was a separate user manual for the Glue Spreader. (*Id*. at 107:15–25.)  Additionally, the fact that Salsa himself was not aware of the existence of the cleaning instructions does not create a dispute of material fact as to whether the Glue Spreader manual contained such instructions.  Finally, Michael Lurz, an IAWW employee, testified that the manuals were kept in a pouch affixed to the machine. (ECF No. 89-5, Exhibit 5 to Massaro Decl. ("Lurz Dep. Tr."), at 12:7–21, 14:6–11).)

The accident at issue occurred on November 4, 2014, while Plaintiff was cleaning or attempting to clean the Glue Spreader for the first time by himself. (Pl. Resp. IUSA 56.1 ¶ 5; Pl. Resp. ISPA 56.1 ¶ 30.)  Plaintiff stood on the outfeed side of the Glue Spreader and sprayed the rollers with water from a hose that he was holding in his right hand. (Pl. Resp. IUSA 56.1 ¶ 74.)  While Plaintiff was spraying the rollers with water, the blue mesh guard was down, or in a closed position, and Plaintiff saw the rollers rotating. (*Id.* ¶ 75.)  Plaintiff then lifted the blue guard with his left hand while still holding the hose in his right hand. (*Id.* ¶ 77.)  Plaintiff knew that the rollers were supposed to stop rotating when the blue guard was lifted, but he did not look to see if they were still rotating when he lifted the guard. (*Id.* ¶ 78.)  Plaintiff bent down to place the hose on a hook on the right side of the Glue Spreader from where he was standing, (*id.* ¶ 79), and as he was placing the hose down, he felt his left hand being "squeezed," and he realized that his left hand was caught in the Glue Spreader. (Pl. Resp. IUSA 56.1 ¶ 80; Pl. Dep. Tr. at 50:6–51:4.)  He pushed the blue safety bar with his knee, which stopped the rollers. (Pl. Resp. IUSA 56.1 ¶ 80.)  As a result of the accident, Plaintiff suffered from a complete loss of his left ring finger, and partial losses of his left small and long fingers. (Pl. Resp. ISPA 56.1 ¶ 1; Pl. Resp. IUSA 56.1 ¶¶ 159–60.)

Plaintiff had been working at IAWW for approximately one month before the accident. (Pl. Resp. IUSA 56.1 ¶ 50.) Plaintiff never operated machinery, and his job responsibilities included cleaning the floors and bathrooms, helping the carpenters, moving materials, preparing bunks for specific machines, and cleaning the Glue Spreader. (*Id.*) Plaintiff's brother, Jose Alex Chica-Hernandez ("Alex"), taught Plaintiff how to clean the Glue Spreader on two occasions, both approximately one week before the accident. (*Id.* ¶ 52.) The two training sessions lasted less than fifteen minutes and consisted of Plaintiff observing Alex cleaning the machine. (*Id.* ¶¶ 52–53.) Plaintiff received no other training on how to clean the Glue Spreader. (*Id.* ¶ 52.)

Plaintiff testified that though he was aware that he "cannot put [his] hand" near the rollers while they were moving, (Pl. Dep. Tr. at 61:7–14), he believed that "if the rollers were moving" and he lifted up the blue mesh guard, "the machine would stop." (*Id.* at 61:15–62:5.) Plaintiff also testified that prior to the accident, he did not know that his hand could get caught in the rollers and get injured. (*Id.* at 81:23–82:3.) Plaintiff testified that he did not read or look at any of the warnings on the Glue Spreader before cleaning it, (*id.* at 80:15–81:6), he did not "know which were the instructions," (*id.* at 80:25–81:2), and he did not review the user manual for the Pressing Line or for the Glue Spreader. (*Id.* at 80:2–5.)

Plaintiff submitted as an exhibit to the declaration of Jay Massaro, counsel for Plaintiff, an email communication between certain IUSA employees and certain individuals at Osama Technologies indicating that IUSA had notice that its Glue Spreader was involved in Plaintiff's accident at least as of November 5, 2014, the day after the accident.  (ECF No. 89-19, Exhibit 19 to Massaro Decl. ("IUSA November 5, 2014 Email").)  The email chain consists of two emails, the first of which is from a Crista at IUSA to a Marco Tinti and a Simone Perozzi at Osama Technologies, stating: "We have an urgent request for spare parts on the . . . Glue Spreader sold to [IAWW].  Attached is a diagram of the parts. They are needing items 6, 7, 8.  Someone may have lost their hand today in an accident.  It was their fault for disabling the safety switch on this grill! . . . Please send a sales offer to us for these items . . . ."  (*Id.*)  The second email is a response from Simone Perozzi that states, in relevant part, "Here is our offer . . . Complete set with protection grill and 'supports' on the sides . . . ."  (*Id.*)  There is no evidence in the record explaining or illustrating "items 6, 7, 8" or the "Complete set with protection grill and 'supports' on the sides."  After Plaintiff's accident on November 4, 2014, there is no evidence in the record documenting any inspection of the Glue Spreader undertaken by IAWW or Defendants, in the form of photographs, maintenance log, reports, or notes, until 2018.  (*Cf.* Lurz Dep. Tr. at 45:6–48:24;

ECF No. 89-2, Exhibit 2 to Massaro Decl. ("Mojum Dep. Tr."), at 83:20—84:19.)

In September 2018, nearly four years after the accident, IAWW requested that IUSA send a technician to service the Pressing Line and the Glue Spreader. (Pl. Resp. IUSA 56.1 ¶ 20.) The IUSA technician sent to service the machine discovered that the Glue Spreader's limit switches, integrated with the three guards to stop the operation of the rollers when the guards were in an up or open position, had been bypassed. (Ortmayer Dep. Tr. at 53:3—13.) The two limit switches for the blue guards (on both the infeed and outfeed sides) were bypassed by means of wrapping tape around an activation cam which caused the switches to stay active even when the guards were lifted. (*Id.*) The third limit switch for the silver metal guard/grill had corroded to a point where it was no longer operational, and a jumper cable had been installed in the electric panel to bypass the switch to keep the machine running. (*Id.*)[6] There is no evidence in the record when the bypasses of

---

[6] The Court finds that although the timing of the bypasses has not been established, Plaintiff has failed to establish that there is a dispute of fact as to whether the limit switch supervising the silver metal guard was bypassed using a jumper wire. (Pl. Resp. IUSA 56.1 ¶ 21.) Plaintiff asserts that the testimony of Mr. Ortmayer "that a jumper cable was utilized to disable one of the three interlocks is inadmissible pursuant to the sham affidavit doctrine because said testimony is directly contradicted by IUSA's Interrogatory Responses, which Mr. Ortmayer verified." (ECF No. 91, Plaintiff's Memorandum of Law in Opposition to ISPA's Motion for Summary Judgment ("Pl. ISPA Opp."), at 2.) The Court finds that Ortmayer's deposition testimony does not contradict his interrogatory response, which stated, "Plaintiff's injuries were caused by [IAWW] and other unknown parties that made material alterations to the Product in the form of overriding safety measures by wrapping tape around portions of the machine that, if unaltered, would prevent the press from operating with the safety screens in the open position." (ECF No. 88-16, IUSA's Responses to

the interlocks with tape and wire occurred.  (*Id.* at 57:3–19.)
Specifically, the record does not establish whether the two tape
and one wire bypasses were present on the limit switches at the
time of delivery to IAWW in 2011, or on November 4, 2014, the date
of Plaintiff's accident.

## II.  Dr. Ojalvo's Proposed  Expert Opinions

### *Dr. Ojalvo's Expert Reports*

Plaintiff primarily relies on the opinions of his
proposed expert witness, Dr. Ojalvo, to support his design defect
and failure to warn claims.  The Court notes that Plaintiff
submitted two expert reports from Dr. Ojalvo, one dated February
2020 and the other dated August 2020, as exhibits to the
Declaration of Jay Massaro.  (ECF No. 89-27, Exhibit 27 to Massaro
Decl. ("Ojalvo Expert Report"); Ojalvo Suppl. Expert Report.)  On
the other hand, IUSA filed three Rule 26 Expert Disclosures from
Plaintiff, dated February 19, 2020, (ECF Nos. 88-11–88-12),
September 8, 2020, (ECF No. 88-13), and September 21, 2020 (ECF
No. 88-14), and attached Dr. Ojalvo's February 2020, September
2020, and August 2020 Expert Reports, respectively.  ISPA states

---

Plaintiff's First Set of Interrogatories, at 7.)  *See also Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34 (2d Cir. 2015) (explaining that Rule 30(b)(6) testimony "is 'binding' in the sense that whatever its deponent says can be used against the organization . . . [b]ut Rule 30(b)(6) testimony is not 'binding' in the sense that it precludes the deponent from correcting, explaining, or supplementing its statements.").  The Court finds, however, that the record does not establish when the alterations bypassing the limit switches occurred and whether the alternations existed at the time of Plaintiff's accident.

that Dr. Ojalvo's September 2020 report was "retracted by plaintiff's counsel under a claim of privilege as a draft report." (ECF No. 82, ISPA's Memorandum of Law in Support of its Motion for Summary Judgment ("ISPA Mem."), at 8 n.2.)   Therefore, the Court considers only Dr. Ojalvo's February 2020 and August 2020 expert reports for the purpose of deciding the instant motions.   (*See* Pl. Resp. ISPA 56.1 ¶ 148 ("The report stating 'September 2020' was a draft report that was disclosed accidentally.").)

Dr. Ojalvo had opined in his first expert report of February 2020, that the Pressing Line was defectively designed because the guards restricting access to the rollers "can easily be opened without deactivating the power to the rollers," not having been equipped with "an interlocked guard (i.e. a device that automatically cuts the power to the machine when the guard is opened) and/or by another means such as a photoelectric presence sensing device that would automatically cut power to the machine when a body part or other foreign object entered the hazard zone." (Ojalvo Expert Report at 15.)   In addition, Dr. Ojalvo had concluded in February 2020 that Plaintiff's incident could have been avoided if the user manual contained clear, explicit instructions on how to safely clean the rollers.   (*Id.* at 18.) Though Dr. Ojalvo testified during his deposition that he plans to only present at trial the conclusions from his supplemental report of August 2020, (*see* Ojalvo Dep. Tr. at 115:3—18), the Court leaves

12

open the possibility of hearing Dr. Ojalvo's testimony regarding his February 2020 report.

In his supplemental report of August 2020, Dr. Ojalvo states that at the time his initial report was issued in February 2020, he was "unaware of two important pieces of information that [he was] only informed of this month [August 2020], when reviewing three defense expert engineering reports" and that the "[i]nformation in these reports led [him] to request depositions given by the plaintiff's coworkers at [IAWW] and members of the defendants [ISPA] and [IUSA] organizations. The new information . . . centers on the facts that 1) [the Glue Spreader] had been tampered with so that its safety interlocks had been deactivated and 2) there existed a use and maintenance manual for [the Glue Spreader] not previously supplied to [him]." (Ojalvo Suppl. Expert Report at 1.)

With respect to the Glue Spreader's design, Dr. Ojalvo opined that "[i]t may be stated to a reasonable degree of engineering certainty that the [Glue Spreader] installed at [IAWW] was unreasonably dangerous and a significant factor in the cause of [Plaintiff's injury]" because the limit switches supervising the guards were "too easy to defeat." (*Id.* at 11.) In support, Dr. Ojalvo asserted that the Glue Spreader did not comport with the industry standards at the time of its design and manufacture, citing to the following: (1) Section 7.1.6 and E7.1.6 of the

American National Standards Institute ("ANSI")[7] safety standard B11.19-2003 provide that "[i]nterlocks should be designed to discourage the capability to easily bypass the interlock with readily available items such as tape, pieces of metal, screws, tools, etc.," (ECF No. 89-31, Exhibit 31 to Massaro Decl., at 13); and (2) Section 5.7 of the International Organization for Standardization ("ISO") safety standard, amended in 2007, provides that "interlocking devices shall be designed . . . so that they cannot be defeated in a reasonably foreseeable manner. . . . Typically, [defeat in a reasonably foreseeable manner] can mean 'intended operation achieved manually or with a readily available object.'"[8] (ECF No. 89-24, Exhibit 24 to Massaro Decl., at 1—2.)

As to an alternative design, Dr. Ojalvo opined that the Glue Spreader could have used "interlocks that are difficult to

---

[7] "ANSI standards are relied upon by the manufacturers of machinery and by experts in various fields to conduct evaluations of the safety of machinery and processes." *Del Civ v. Beloit Corp.*, 901 F. Supp. 539, 545 (E.D.N.Y. 1995).

[8] Defendants contend that Dr. Ojalvo "does not rely on the appropriate ANSI standard applicable to the subject machine . . . ." (ECF No. 94, ISPA's Reply Memorandum of Law in Support of its Motion for Summary Judgment ("ISPA Reply"), at 1 n.1; *see also* ECF No. 95, IUSA's Reply Memorandum of Law in Support of its Motion for Summary Judgment ("IUSA Reply"), at 9 ("[P]laintiff makes repeated references to engineering standards from [ANSI] and [ISO] in a futile effort to demonstrate they were somehow violated and such violation is per se proof of a defective design. However, the record is replete with references to their inapplicability to the equipment/machinery involve herein . . . .").) The Court notes that whether a safety standard is applicable is typically a question for the jury. *See Mustafa v. Halkin Tool, Ltd.*, No. 00-cv-4851(DGT), 2007 WL 959704, at *8 n.14 (E.D.N.Y. Mar. 29, 2007) ("Before a promulgated safety standard can even be considered by a jury in a products liability action, the jury must first conclude that the standard represents the general custom or usage in the industry."). The Court concludes that the applicability of the safety standards cited by Dr. Ojalvo, in addition to the other material factual issues as to the design defect claim, set forth *infra*, should be determined by the trier of fact.

bypass" and, as an example, identified a "Schmersal-type electronic interlock," which is "comprised of a solenoid locking mechanism . . . and a locking key." (Ojalvo Suppl. Expert Report at 7.) According to Dr. Ojalvo, if Schmersal interlocks were used, "when a guard door is mechanically opened, the electronic program would remove motor power to the glue rollers and they would stop," thus "result[ing] in the machine providing a 'lock/run' closed guard and an open guard 'unlock/setup' safety mode. Such a system could not be easily defeated by readily available items such as tape, pieces of metal, etc., and if used by Italpresse in their glue machine, would have avoided [Plaintiff's] injury." (*Id.*) As to causation, Dr. Ojalvo opined that "the violation of the ANSI B11.19 and ISO standards regarding the use of readily defeated interlocks was a significant proximate cause of [Plaintiff's] injury." (*Id.* at 8.)

With respect to the warning signs on the Glue Spreader, Dr. Ojalvo opined that "[i]t may be stated to a reasonable degree of engineering certainty that the [Glue Spreader] installed at [IAWW] was unreasonably dangerous and a significant factor in the cause of [Plaintiff's injury]" because there was no "sufficiently explicit warnings on the [Glue Spreader] itself in English (and perhaps in Spanish) instructing users to read and understand the technique for cleaning the rollers . . . ." (*Id.* at 11.) Dr. Ojalvo stated that the warning sign cautioning users to read and

understand the user manual before using the machine was written only in Italian, did not explicitly reference the designation/name and number of the Glue Spreader, and did not make it clear to the user that it was referring specifically to the user manual for the Glue Spreader. (*Id.* at 9.) Furthermore, Dr. Ojalvo stated that "the inclusion of warnings in Italian on a machine for use in an English speaking country serves to clutter the message and reduce its effectiveness." (*Id.*) Dr. Ojalvo opined that Plaintiff's incident likely would not have occurred with more explicit warnings on the Glue Spreader and gave the following alternative warnings as examples:

- "MAKE SURE THAT GUARDS COVERING THE ROLLERS ARE CLOSED WHEN ROLLERS ARE MOVING";
- "ONLY CLEAN THE GLUE MACHINE ROLLERS REMOTELY USING THE MACHINE SCRUB BRUSHES"; and
- "IF ROLLER CLEANING IS REQUIRED WITH GUARDS OPEN MAKE SURE THE ROLLERS ARE NOT TURNING."

(*Id.*)

### Dr. Ojalvo's Deposition Testimony

Dr. Ojalvo testified that on October 2, 2017, he inspected the Pressing Line, including the Glue Spreader, and interviewed Plaintiff. (Ojalvo Dep. Tr. at 18:9–14, 19:13–18.) He testified further that, at the time of the inspection, he could not tell whether there were limit switches equipped to the Glue Spreader. (*Id.* at 82:19–83:14.) Dr. Ojalvo testified that, prior to his deposition on January 7, 2021, he had not seen Exhibit J to

16

IUSA's Responses to Plaintiff's First Set of Interrogatories, which are photographs taken by IUSA's technician in September 2018, almost four years after Plaintiff's accident, when the Pressing Line was serviced at the request of IAWW. (*Id.* at 120:17—121:6.) The photographs demonstrated the ways in which the three limit switches for the safety guards of the Glue Spreader were bypassed as of 2018. (*Id.*) When asked whether the two limit switches for the blue mesh guards (one on the infeed side and the other on the outfeed side) that were bypassed using tape were also bypassed electrically, Dr. Ojalvo answered that he does not know. (*Id.* at 120:17—123:8.) As to the limit switch for the silver metal guard/grill that was bypassed using a jumper wire, Dr. Ojalvo testified that does not know whether it "was easily bypassed electrically." (*Id.* at 108:6—109:3 *see id.* ("Q. Okay, do you know if this was easily bypassed electrically? A. I don't know. Q. And that relates to the subject machine. There's an instance where you don't know, perhaps, specific data about the capabilities of the existing interlocks on this machine, correct? A. That's right. I couldn't get that out of the manual.").)

When asked to describe his methodology, Dr. Ojalvo testified that his methodology was "[t]o do an inspection with the plaintiff present . . . for him to describe how the accident occurred, to look at the manuals that were available regarding the operation and maintenance of the machine and eventually to have

the information regarding the people who were knowledgeable about the interlock defeat and to have available the standards associated with machine interlocks that [he] cited [in his expert report]." (*Id.* at 166:21–167:13.)   Dr. Ojalvo testified that he did not conduct any testing for this case other than his reenactment of the accident based on his interview of Plaintiff to determine whether the accident could have occurred as described by Plaintiff. (*See id.* at 45:16–46:21, 47:23–49:14, 49:21–50:1; 50:9–52:4, 78:22–79:23.)

With respect to a feasible alternative design, Dr. Ojalvo testified that he did not propose a specific alternative limit switch that should have been equipped on the Glue Spreader but opined generally that there were many available at the time that could have been used that were harder to bypass.  (*See id.* at

18

175:2—176:7[9], 179:11—180:8[10].)  He also testified that he did not research "which model interlock would have been best suited for [the Glue Spreader]." (*Id.* at 171:18—20.)  And because he did not propose a specific alternative interlock, Dr. Ojalvo did not "build an exemplar proposed interlock," (*id.* at 170:24—171:5), prepare "a circuit diagram of [the] proposed interlock design," (*id.* at 179:11—13), or perform any "failure modes or effects analysis" of the proposed design, (*id.* at 14—16).  Additionally, though Dr. Ojalvo had opined in his August 2020 supplemental expert report that a Schmersal type interlock would have prevented Plaintiff's

---

[9] Q. . . . You're proposing or you opined in this case this machine was defectively designed but your position is that you have not proposed a reasonable alternative design that if it had been used would have prevented this accident.  Fair statement?
. . .
A. I did not propose a specific design that would have been acceptable.  But I had enough information to make the statement that it was possible.
Q. But possible is certainly different than reasonable, would you say?  Would you agree?
A. I would include the word reasonable in my definition.
Q. And so do you have -- just so I'm clear, are you or are you not proffering a reasonable alternative design that would have prevented this accident in this case?
A. Only in generalities, not specific detail.
Q. What does that mean, sir, only in generalities, not in specific details?  I don't understand what you're saying.
A. I'm saying that given the machine, given the spaces that are available, given the technology of interlocks that were available at the time the machine was designed and manufactured, that there were sufficient possibilities to come up with multiple designs that would have satisfied the [safety] standards.
[10] Q. Can you state to a reasonable degree of engineering certainty that your proposed interlock design would have prevented the plaintiff's injury?
A. Well I don't have a specific design, I have a concept.  And I'm aware of what was available to the manufacturer at the time.  And I think that I could effectively design something if asked to do it.
Q. So if I understand your testimony correctly, you have opined that the machine was defective in its design because the interlocks could be bypassed, you have said it's possible to build a [sic] interlocks that cannot be bypassed or not easily bypassed but you have not proposed any alternative design in this case; is that fair to say?
A. Correct. Only generalities.

accident, he could not confirm during his deposition whether the interlocks that were equipped on the Glue Spreader were in fact Schmersal interlocks.  (*Id.* at 167:14–168:7.)  And when asked whether he was aware of any other glue spreader machine that incorporates a Schmersal interlock, Dr. Ojalvo answered, "No.  I haven't done a study of that."  (*Id.* at 180:19–22.)

As to the adequacy of the warning signs that were on the Glue Spreader, Dr. Ojalvo testified that his biggest criticism is "the lack of any indication" that there is a user manual specific to the Glue Spreader.  (*Id.* at 190:24–191:7.)  He testified that the pictograms displayed the hazards adequately, (*id.* at 187:14–16), and the font sizes of the written warnings were sufficient, (*id.* at 187:3–13).  Dr. Ojalvo testified that had not tested his proposed warning, nor published his proposed warnings in a peer-reviewed publication, (*id.* at 187:17–23), and that none of his opinions in this case were peer reviewed.  (*Id.* at 166:21–167:13.)  Finally, Dr. Ojalvo supplemented his expert report during the deposition to include the opinion that the user manuals for the Pressing Line and the Glue Spreader were both inadequate and that their inadequacy was a primary factor in the cause of Plaintiff's accident.  (*Id.* at 150:23–151:2.)

## **LEGAL STANDARD**

Summary judgment shall be granted to a movant who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

When bringing a motion for summary judgment, the movant carries the burden of demonstrating the absence of any disputed issues of material fact and entitlement to judgment as a matter of law. *Rojas*, 660 F.3d at 104. In deciding a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A moving party may indicate the absence of a factual dispute by "showing . . . that an adverse party cannot produce admissible

evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the moving party has met its burden, the nonmoving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322—23 (1986)).

## DISCUSSION

### I.   Design Defect

In New York, "to establish a prima facie case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 208 (N.Y. 1983). The design of a product is "not reasonably safe" if "a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Id.* "The plaintiff, of course, is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." *Id.* "This standard demands an inquiry into such factors as (1) the product's utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood

that the product will cause injury, (4) the availability of a safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user, and (7) the manufacturer's ability to spread the cost of any safety-related design changes." *Denny v. Ford Motor Co.*, 662 N.E.2d 730, 735 (N.Y. 1995) (citation omitted).

The Court finds that there are genuine issues of material fact precluding the grant of summary judgment for Defendants on the design defect claim. Specifically, Defendants' primary theory is that the bypassing of the safety interlocks by third parties, rather than a defective design, was the cause of Plaintiff's accident. Plaintiff's theory is that the safety interlocks were too easily bypassed due to Defendants' defective design. Furthermore, though the parties presume that the same bypasses of the safety interlocks that were discovered by IUSA in 2018 existed at the time of Plaintiff's 2014 accident and, in turn, caused the accident, there is no evidence in the record establishing such presumption. In fact, Defendant IUSA's representative admitted that he did not know when the bypasses were applied. (*See* Ortmayer Dep. Tr. at 57:3—19 ("Q. Now, . . . as far as the discovery that the . . . interlock switches had been disabled, and the jumper wire bypassed the switch, and those types of things. Was there

any way to determine when this may have been done?  Or how long it may have been that way?  A. No.  Q. So there is nothing, to your knowledge, definitive showing that that is the way the machine would have been back in 2014 on November 4th?" . . . A. No.").) Indeed, the record includes only the IAWW service and maintenance records for its machines, including Defendants' Pressing Line and Glue Spreader, from 2018 and 2019, but not from 2011 when IAWW purchased the Pressing Line up to 2014, the year Plaintiff's accident occurred.  (*See* Lurz Dep. Tr. at 45:6—48:24.)  Nor does the record contain any IAWW service and maintenance records between 2014 and 2018.  (*Id.*)  And Defendants have not proffered any of their own service and maintenance records for the machine that injured Plaintiff preceding the September 2018 inspection by IUSA.

Plaintiff submitted as an exhibit an email exchange on November 5, 2014 in which an individual named Crista at IUSA made a request to Osama Technologies for certain spare parts for the Glue Spreader, "items 6, 7, 8," on behalf of IAWW.  (IUSA November 5, 2014 Email.)  There is no explanation or diagram of "items 6, 7, 8."  In that same email, Crista wrote, "[s]omeone may have lost their hand today in an accident.  It was their fault for disabling the safety switch on this grill."  (*Id.*)  In response, a Simone Perozzi at Osama Technologies offered to send a "[c]omplete set with protection grill and 'supports' on the sides . . . ."  (*Id.*) The Court notes, without determining whether the parties would be

able to lay the proper foundation for this document at trial, that though the email communication may suggest that the limit switch for the silver metal guard/grill had been "disabl[ed]" in 2014, it is not clear whether the disabling was done in the same manner that it was found in 2018, by using a jumper wire to bypass the switch, or whether the bypassed switch that had corroded to a point of being inoperable in 2018 was also corroded and inoperable on November 4, 2014, the day of Plaintiff's accident.  And if the limit switch had corroded by November 2014, less than four years after the Pressing Line was purchased brand new by IAWW, the jury could find that the limit switch was defectively designed.  The email also makes no mention of the two limit switches for the blue mesh guards.  Thus material issues of fact remain as to Defendants' theory that a design defect did not exist and did not cause Plaintiff's accident.

Furthermore, the diagram of the parts, referred to in the email from IUSA's Crista to Osama Technologies, displaying the parts of the Glue Spreader that needed to be replaced, described as "items 6, 7, 8," is not before the Court.  (*Id.*)  It is also unclear why the silver metal guard/grill had to be replaced in its entirety, along with the "'supports' on the sides" if the accident occurred due to the "disabling [of] the safety switch on [the] grill."  (*Id.*)  The service and maintenance records in the possession, custody, and control of Defendants are not before the

Court.  As such, because there are material issues of fact related to whether the corrosion of the safety interlock and bypasses found in 2018 by IUSA's technician also existed at the time of Plaintiff's accident and caused the accident, the Court must deny summary judgment in favor of Defendants.  In addition, Dr. Ojalvo's expert opinion as to design defect is that the Glue Spreader was defectively designed either because: (1) its rollers failed to stop when the blue guard was lifted up; or (2) its safety interlocks were too easily overridden with objects that were readily available, in violation of the relevant industry safety standards at the time.  Dr. Ojalvo's second design defect theory, proffered in his August 2018 supplemental expert report, is based on the same factual presumption that the bypasses of the safety interlocks that were discovered in 2018 also existed in 2014 and caused Plaintiff's accident, which the Court finds is not established by the record evidence.  Consequently, the Court also denies Defendants' motions to exclude Dr. Ojalvo's expert opinion as to defective design.

## II. Failure to Warn

### A. Admissibility of Dr. Ojalvo's Testimony

Before considering the merits of Defendants' motions for summary judgment on failure to warn, the Court, as a threshold matter, must address Defendants' argument that Dr. Ojalvo's opinion as to the adequacy of the warnings should be excluded as

inadmissible.  *See Cohalan v. Genie Indus., Inc.*, No. 10-cv-2415(JMF), 2013 WL 829150, at *2 (S.D.N.Y. Mar. 1, 2013) ("Because on a summary judgment motion a 'district court properly considers only evidence that would be admissible at trial,' a court may—and sometimes must—decide questions regarding the admissibility of evidence, including expert opinion evidence, on a motion for summary judgment.") (citations omitted).

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Thus, pursuant to Rule 702, the Court must make several determinations before admitting expert testimony: (1) whether the witness is a qualified expert; (2) whether the opinion is based on reliable data and methodology; and (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine an issue of fact.  *See Beruashvili v. Hobart Corp.*, No. 05-cv-1646(ENV), 2010 WL 11622750, at *4 (E.D.N.Y. July 15, 2010).

Though it is "[t]he proponent of the expert testimony [who] bears the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied," *Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, 419 F. Supp. 3d 490, 511 (E.D.N.Y. 2019) (internal quotation marks and citation omitted), "the district court is the ultimate 'gatekeeper.'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citations omitted). *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (holding that whether the area of expertise of a proffered expert witness is technical, scientific, or more generally "experience-based," the district court, in its "gatekeeping" function, must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."). At the same time, Court recognizes that the Rule 702 inquiry is "liberal and flexible," *Zsa Zsa Jewels*, 419 F. Supp. 3d at 511, with a general presumption of admissibility. *Id.*

If the expert testimony is found to be inadmissible under Rule 702 and excluded, "the summary judgment determination is made by the district court on a record that does not contain that evidence. Such an analysis must be conducted even if precluding the expert testimony would be outcome determinative."

*Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 173—74 (E.D.N.Y. 2008) (citations omitted).

### 1.   Qualifications

Dr. Ojalvo is a licensed Professional Engineer in New York, Connecticut, Florida, and California.  (ECF No. 88-12, Exhibit B to Plaintiff's Rule 26 Expert Disclosure dated February 19, 2022, Curriculum Vitae of Irving U. Ojalvo ("Ojalvo CV"), at 2; Ojalvo Dep. Tr. at 8:2—5.)  He holds a bachelor's degree in biomedical engineering from the City College of New York, a Master of Science degree from the Massachusetts Institute of Technology, and a Doctor of Science degree from New York University.  (Ojalvo CV at 2.)  He was a professor of mechanical engineering at the University of Bridgeport from 1982 to 1990.  (*Id.*)  Dr. Ojalvo is also active in professional organizations, including the Society of Automotive Engineers, the Human Factors & Ergonomics Society, and the Institute of Transportation Engineers.  (*Id.*)  Dr. Ojalvo testified that he has significant experience designing warnings for industrial machines and consumer products, and in the field of human factors.  (Ojalvo CV; Ojalvo Dep. Tr. at 202:11—204:8.) Defendants do not contend that Dr. Ojalvo is unqualified to opine on the adequacy of the warning signs at issue, and the Court finds him qualified.

2.    **Reliability and Relevance**

"In assessing the reliability of a proffered expert's testimony, the court's inquiry under *Daubert* focuses not on the substance of the expert's conclusions, but on the principles and methodology used to generate the conclusions." *Clarke*, 219 F. Supp. 2d at 332.   Expert testimony should be excluded when it is "speculative," "conjectural" or based on assumptions that are "so unrealistic and contradictory as to suggest bad faith." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996) (internal quotation marks and citations omitted).   *See Barban v. Rheem Textile Sys., Inc.*, No. 01-cv-8475(ILG), 2005 WL 387660, at *6 (E.D.N.Y. Feb. 11, 2005) ("It is by now well settled that *Daubert* and its progeny requires the Court to close the gate to opinion evidence . . . that is bottomed upon nothing more than speculation and guesswork.").   Moreover, courts are not required to admit expert opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert.   A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).

In *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court articulated several factors to guide district courts in assessing the reliability of expert testimony: (1) whether the expert's theory or technique has been or can be tested; (2) whether

30

it has been subjected to peer review and publication; (3) its known or potential rate of error; and (4) its general acceptance by the relevant scientific community. 509 U.S. 579, 593–94 (1993). The four factors, however, are not exhaustive and ought to be applied flexibly, as they "may or may not be pertinent in assessing reliability, depending on the nature of the case, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150 (internal quotation marks and citation omitted). Indeed, "[e]xpert engineering testimony may rest on scientific foundations, the examination of which invokes the *Daubert* factors directly, but may also rest on the personal knowledge or experience of the engineer." *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001); *see Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Where, as here, an engineering expert proffers opinions based on his education and experience, not all four *Daubert* factors may be applicable to the Court's reliability analysis; even so, it may still be appropriate for the trial judge to ask, for example, "how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community." *Cacciola*, 127 F. Supp. 2d at 180 (internal quotation marks and citation omitted).

31

As to Dr. Ojalvo's opinions on the adequacy of the warnings on the Glue Spreader and his proposed alternative warnings, Defendants contend that they are "no more than off-the-cuff challenges to the Glue Spreader's current warnings without any substantial support." (ISPA Mem. at 26.) Specifically, they argue that Dr. Ojalvo's proposed warnings were not tested nor peer reviewed, and that Dr. Ojalvo "had not so much as thought about which signal words would be used in these warnings" and "could not identify any glue spreader on the market that applied his proposed English language warnings." (*Id.*; IUSA Reply Mem. at 10.) The Court notes that Defendants fail to cite any case that supports their proposition that proposed alternative warnings, like proposed alternative designs, must undergo testing as to feasibility or that their feasibility must be demonstrated through examples of similar machines in the marketplace that incorporate the proposed warnings. *But cf. Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 482 (S.D.N.Y. 2004) (admitting an expert's opinion on the inadequacy of warnings, noting that the expert based his opinion on "his experience in consumer safety and on several articles on warnings and labeling."). Given that Dr. Ojalvo has significant experience with designing warnings for industrial machines and in the field of human factors, (Ojalvo CV; Ojalvo Dep. Tr. at 202:11–204:8), the Court finds that Dr. Ojalvo's testimony as to the design and effectiveness of the warnings is

reliable and will assist the jury in deciding Plaintiff's failure to warn claim.  Fed. R. Evid. 702.

> **B.   Summary Judgment**

"A defendant may be liable under a negligence or strict products liability theory by failing to adequately warn of a potentially harmful aspect of the product.  There is no difference between the prima facie elements of a failure to warn claim sounding in negligence and one sounding in strict products liability." *Mustafa*, 2007 WL 959704, at *17.  *See Enright v. Eli Lilly & Co.*, 570 N.E.2d 198, 203 (N.Y. 1991) (noting that a failure to warn claim "couched in terms of strict liability, is indistinguishable from a negligence claim.") (citation omitted). Either way, a failure to warn plaintiff must show "(1) that a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of harm." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 84 (S.D.N.Y. Dec. 19, 2001).  A manufacturer generally has a duty to warn against: (1) latent dangers resulting from the foreseeable uses of its product about which it knew or should have known; and (2) dangers of reasonably foreseeable unintended uses of a product. *Clarke*, 219 F. Supp. 2d at 329.  "Under New York law, the jury does not need expert testimony to find a warning inadequate, but may use its own judgment considering all the circumstances."

*Billiar v. Minn. Mining & Mfg. Co.*, 623 F.2d 240, 247 (2d Cir. 1980).

The New York Court of Appeals has described the standard for evaluating failure to warn claims as "intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause." *Liriano v. Hobart Corp. ("Liriano I")*, 700 N.E.2d 303, 309 (N.Y. 1998) (internal citation omitted). Given this fact-intensive inquiry, as the Second Circuit has emphasized, "[t]he adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997) (citations omitted); *see Liriano v. Hobart Corp. ("Liriano II")*, 132 F.3d 124, 131 (2d Cir. 1998) (stating that courts have "squarely h[e]ld that it is up to the jury to decide whether the manufacturer, in fact, has a duty to warn.") (citations omitted); *Johnson v. Johnson Chem. Co., Inc.*, 588 N.Y.S.2d 607, 610 (2d Dep't 1992) ("Whether a particular way of misusing a product is reasonably foreseeable, and whether the warnings which accompany a product are adequate to deter such potential misuse, are ordinarily questions for the jury.") (citations omitted); *Cooley v. Carter-Wallace Inc.*, 478 N.Y.S.2d 375, 376 (4th Dep't

34

1984) ("The adequacy of the warning in a products liability case based on a failure to warn is, in all but the most unusual circumstances, a question of fact to be determined at trial.").

### 1.  Knowledge of the User

Notwithstanding the foregoing considerations, a court may nevertheless dismiss a failure to warn claim as a matter of law where the plaintiff cannot prove that the absence of warning proximately caused his injury.  *See Liriano I*, 700 N.E.2d at 308 (no causation where "the injured party was fully aware of the hazard through general knowledge, observation or common sense").  A plaintiff's knowledge of a given risk does not change a manufacturer's duty to warn but "goes to the analytically distinct issue of whether a putative breach of that duty was a *cause* of [the] plaintiff's injury."  *Burke v. Spartanics, Ltd.*, 252 F.3d 131, 138 (2d Cir. 2001).  A defendant can show the lack of proximate cause by demonstrating the futility of warnings, through evidence that plaintiff was fully aware of the hazard  through general knowledge, observation, or common sense.  *See also Gonzalez v. Morflo Indus., Inc.*, 931 F. Supp. 159, 168 (E.D.N.Y. 1996) ("[W]here a warning would not have increased the particular injured user's awareness of the danger, failing to warn cannot be said to have been the proximate cause of the accident.").

To fall under the knowledge of the user exception, Plaintiff "must have known about the specific hazard that caused the injury, and must have appreciated the severity of the danger. Although in appropriate cases a court may as a matter of law decide that a manufacturer's warning would have been superfluous given an injured party's actual knowledge of the specific hazard that caused the injury, where reasonable minds might disagree as to the extent of [the] plaintiff's knowledge of the hazard, the question is one for the jury." *Leibstein v. LaFarge N. Am. Inc.*, 689 F. Supp. 2d 373, 388–89 (E.D.N.Y. Feb. 12, 2010) (internal quotation marks and citations omitted).

Though Defendants argue that Plaintiff was fully aware of the danger posed by placing his hand near moving rollers, (ISPA Mem. at 24; ECF No. 85, IUSA's Memorandum of Law in Support of its Motion for Summary Judgment ("IUSA Mem."), at 18 ("plaintiff acknowledged that he recognized the danger posed by moving rollers and he knew not to put his hands near them while they were rotating.")), the Court finds that reasonable minds could differ as to the extent of Plaintiff's knowledge of the danger posed by the Glue Spreader, which, unbeknownst to Plaintiff, included the risk of its limit switches either failing or being bypassed and failing to stop when the guard was lifted during cleaning. Specifically, the Court notes Plaintiff's testimony that though he was aware that he "cannot put [his] hand" near the rollers while

36

they were moving, (Pl. Dep. Tr. at 61:7–14), he believed that "if the rollers were moving" and he lifted up the blue mesh guard, "the machine would stop." (*Id.* at 61:15–62:5.) Accordingly, the Court concludes that there are genuine issues of material fact concerning the extent of Plaintiff's knowledge of the danger presented by the Glue Spreader, and declines to grant summary judgment on failure to warn based on Plaintiff's knowledge of the risk.

### 2.   Open and Obvious Risk

A court may also dismiss a failure to warn claim as a matter of law where the manufacturer had no duty to warn because the hazard was patently dangerous or posed an open and obvious risk. *See Liriano I*, 700 N.E.2d at 308 ("Where a danger is readily apparent as a matter of common sense, there should be no liability for failing to warn someone of a risk or hazard which he [or she] appreciated to the same extent as a warning would have provided. Put differently, when a warning would have added nothing to the user's appreciation of the danger, no duty to warn exists as no benefit would be gained by requiring a warning.") (internal quotation marks and citation omitted) (alteration in original). In contrast, "the open and obvious defense generally should not apply when there are aspects of the hazard which are concealed or not reasonably apparent to the user." *Id.*

The open and obvious inquiry goes to the manufacturer's duty and depends on, not what any particular plaintiff understands about the risk, but whether reasonably foreseeable users of the product would perceive it to be open and obvious. *Burke*, 252 F.3d at 137−38. And "[t]he class of reasonably foreseeable users will, of course, encompass a spectrum of persons with widely varying abilities and experience bearing on their perception of the hazards at hand." *Id.* at 138. Plaintiff's own knowledge, though a relevant reference point, does not determine the outcome of the open and obvious inquiry, which is an objective one, and whether a reasonably foreseeable user of the Glue Spreader would consider the potential risk of its use to be open and obvious is a fact-intensive inquiry that is more appropriate for the jury. The Court also notes that the nonobvious nature of the potential danger presented by the failure or bypassing of the interlocks is demonstrated by the fact that Plaintiff's expert, who has three degrees in mechanical engineering, did not notice the interlocks at the time of his inspection in October 2017. Accordingly, the Court concludes that there are genuine issues of material fact on whether the hazard presented by the Glue Spreader is open and obvious.

Finally, the Court respectfully declines to grant summary judgment on failure to warn in favor of Defendants based on their argument that the allegedly inadequate warnings were not

the proximate cause of Plaintiff's injury because Plaintiff, who reads and understands little English, did not read the warning signs or the user manuals.  Courts have found that "a plaintiff . . . may be able to prevail under New York law with respect to his failure to warn claim, even though it is undisputed that he failed to read the warnings, if he can demonstrate that adequate warnings would have come to the attention of a third party, such as fellow workers or an employer, and they would have informed him of those warnings."  *Humphrey*, 556 F. Supp. 2d at 181; *see, e.g.*, *Sorto-Romero v. Delta Intern. Mach. Corp.*, No. 05-cv-5172(SJF), 2007 WL 2816191, at *12 (E.D.N.Y. Sept. 24, 2007) ("[I]n light of Plaintiff's inability to read the warnings, Plaintiff may be able to prove causation whereby a third party may have conveyed the warning to him.") (citing New York cases); *Mustafa*, 2007 WL 959704, at *19 ("[Plaintiff] could prove the requisite ca[usa]l link in light of his inability to read the warning . . . under a theory of causation whereby [a] third party may have conveyed the warning to him."); *Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 570 (S.D.N.Y. 2005) ("the 'realities of society'—i.e., the realties of the mountain biking community—might have resulted in Plaintiff's friends advising him not to use a Y5 model for jumping, even if Plaintiff had not read the warning himself.") (citation omitted); *Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 445 n.24 (S.D.N.Y. 1999) (a witness who felt concerned about plaintiff's use of a

trampoline but did not say anything might have voiced her concern had adequate warnings accompanied the product).

In the instant case, it is undisputed that at least Alex and German Monterosa speak Spanish, and Michael Lurz testified that IAWW had "several people that speak English and Spanish" to "interpret, if need be." (Lurz Dep. Tr. at 52:20–22.)  Because it is possible that if the jury finds that adequate warnings regarding the machine could have come to the attention of Alex, Monterosa, or other IAWW employees and, in turn, the warnings could have been conveyed to Plaintiff, a jury could also find the requisite causal link necessary for Plaintiff to sustain failure to warn.[11] Similarly, the Court finds that notwithstanding IAWW's purported failure to adequately train Plaintiff, the jury could find that adequate signs nonetheless could have prevented Plaintiff's injury.

For the reasons stated above, Defendants' motions for summary judgment on Plaintiff's failure to warn claim are denied.

---

[11] Though Defendants presented evidence that Alex, Monterosa, and Lurz did not read the user manuals, (ECF No. 89-8, Exhibit 8 to Massaro Decl. ("Alex Dep. Tr."), at 21:9–14; ECF No. 89-6, Exhibit 6 to Massaro Decl. ("Monterosa Dep. Tr."), at 67:20–23; Lurz Dep. Tr. at 12:4–6), this does not preclude a finding of fact that adequate warnings posted on the face of the Glue Spreader may have prevented Plaintiff's injury.

### III. Manufacturing Defect

Plaintiff advised the Court in his letter response to IUSA's letter motion for a pre-motion conference, dated April 5, 2021, that he withdraws "any claims of allegations of manufacturing defects." (ECF No. 77.) Though Plaintiff did not state the same in his response to ISPA's letter motion for a pre-motion conference, (ECF No. 76), the Court concludes that summary judgment for Defendants on the manufacturing defect claim is appropriate, based on Plaintiff's failure to present any evidence supporting this claim, or opposing ISPA's motion for summary judgment on the manufacturing defect claim. Thus, because Plaintiff has either abandoned or failed to support his manufacturing defects claim, summary judgment dismissing this claim is granted based on Defendants' evidence in the record. *See Cuntan v. Hitachi KOKI USA, Ltd.*, No. 06-cv-3898(RRM), 2009 WL 3334364, at *18 (E.D.N.Y. Oct. 15, 2009) ("In his response to the defendants' motion for summary judgment, plaintiff makes no claim that he is pursuing damages on the theory of a manufacturing defect and provides no evidence in support of such a claim. As a result, plaintiff either has abandoned his manufacturing defect claim altogether or has failed to meet his burden of proving that any such defect was a 'substantial factor' in causing his injuries.").

## IV.  Breach of Warranty

Defendants move for summary judgment on Plaintiff's breach of express and implied warranty claims on statute-of-limitations grounds.  The Court finds that Defendants are entitled to summary judgment on the breach of warranty claims.  The statute of limitations on a breach of warranty claim is four years, *see* N.Y. U.C.C. § 2-725, and the claim accrues upon delivery of the warrantied product.  *See Solorio v. Asplundh Tree Expert Co.*, No. 02-cv-8035(RJS), 2009 WL 755362, at *5 n.10 (S.D.N.Y. Mar. 23, 2009) ("Claims for breach of implied and express warranties in New York are governed by a four-year statute of limitations, measured from the tender of delivery of the goods.  The statute of limitations for a breach of warranty claim, whether implied or express, begins to run at the time the product is placed in the stream of commerce or at the time of the original sale of the good by the manufacturer, regardless of when the injury was sustained.") (citing N.Y. U.C.C. § 2-725(1); *Heller v. U.S. Suzuki Motor Corp.*, 477 N.E.2d 434 (N.Y. 1985); last citation omitted).  Thus, the Plaintiff's breach of warranty claims accrued in May 2011 when IUSA delivered the Pressing Line to IAWW, and the claims became stale in May 2015.  Plaintiff did not bring this action until November 3, 2017.  Hence, his breach of warranty claims are time barred and summary judgment is granted on these claims.

The Court respectfully rejects Plaintiff's argument that certain language in the *Heller* decision stands for the proposition that "an injured consumer can file a breach of warranty claim within three years of the date of accident." (Pl. ISPA Opp. at 28.) The *Heller* decision did not consider whether an injured plaintiff's breach of warranty claim accrues on the date of the injury. Rather, the issue before the court in *Heller* was whether plaintiff's breach of implied warranty claim accrued on the date of sale to plaintiff by the retailer, or on the earlier date of the transfer of the motorcycle by the distributor to the immediate purchaser, who then apparently transferred it to the retailer that later sold it to Plaintiff. 477 N.E.2d at 435. The court held that a breach of implied warranty claim in a personal injury action against a manufacturer or distributor "accrues on the date the party charged [U.S. Suzuki Motor Corp.] tenders delivery of the product, not on the date that some third party sells it to plaintiff." *Id.* at 436. The court reasoned that "[a] major purpose of the uniform acts, and for the Statutes of Limitation they contain, is to eliminate jurisdictional variations so that concerns doing business nationwide will not be governed by different periods of limitation. . . . [which] is frustrated . . . and the period of exposure to lability becomes unpredictable if the cause of action accrues at the date of sale to the plaintiff . . . ." *Id.* at 437. Thus the court in *Heller* did not confront

the issue of whether breach of warranty claims accrue at the time
of the plaintiff's injury.

Plaintiff relies on the following language in *Heller* to
support his position that his breach of implied warranty claim is
timely because the instant action was brought within three years
of Plaintiff's accident: "A consumer who acts within three years
of the date of the accident or four years from the date of sale,
as the pertinent statutes provide, may now maintain causes of
action in New York to recover against both immediate and remote
parties based on express or implied warranty, negligence or strict
products liability." *Id.* The quoted language was in response to
the dissenting opinion that imposing a four-year statute of
limitations from the date of delivery by the charged party would
result in a plaintiff being "time-barred from prosecuting a cause
of action before he ever had one." *Id.* at 439 n.4. The *Heller*
court stated that its decision "does not limit available remedies
*generally*," so that plaintiffs in personal injury actions,
notwithstanding the four-year statute of limitations for breach of
implied warranty which accrues upon delivery by the charged party,
may nonetheless bring a strict products liability claim within
three years of the date of the injury. *Id.* 436—37 (emphasis
added). *See also id*. at 435—36 (stating that personal injury
actions based on implied warranty, sounding in contract, were
developed "to impose strict liability on manufacturers and sellers

44

for defects in their products" and that some States, including New York, eliminated the traditional privity requirement for such actions to allow purchasers to recover from remote parties; however, "there [was] no need to recognize an action on implied warranty for personal injuries . . . if the jurisdiction recognize[d] a tort action in strict products liability as New York [did]" and "[t]he tort remedy permits the injured plaintiff to seek redress from remote parties in the distributive chain regardless of privity."). As such, the Court grants Defendants' motions for summary judgment and dismisses Plaintiff's breach of express and implied warranty claims as time barred.

## V.   IUSA's Cross Claim for Indemnification Against ISPA

Finally, the Court denies summary judgment as to IUSA's cross claim for indemnification against ISPA. In a strict liability action, "a seller or distributor of a defective product has an implied right of indemnification as against the manufacturer of the product." *Noveck v. PV Holdings Corp.*, 742 F. Supp. 2d 284, 297 (E.D.N.Y. 2010) (citation omitted). The Court, however, declines to prematurely decide the issue of indemnification unless and until it is established that ISPA is liable. As New York courts have noted, "[when] it has not yet been determined whether any party's negligence contributed to [an] accident, a finding of common-law indemnity is premature" *Barraco v. First Lenox Terrace Assoc.*, 810 N.Y.S.2d 8, 11 (1st Dep't 2006). *See also Brockman v.*

45

*Cipriani Wall Street*, 947 N.Y.S.2d 34, 36 (1st Dep't 2012).
Additionally, it is undisputed that Ortmayer, IUSA's
representative, trained at least two IAWW employees in May 2011,
when IAWW purchased the Pressing Line, and Ortmayer testified
during his deposition that his training covered both safety and
maintenance issues with respect to the machine.  (Ortmayer Dep.
Tr. at 11:16:15.)  The Court finds that there are triable issues
of fact as to whether ISPA is liable based on the design and the
warning signs of the Glue Spreader, and whether IUSA was negligent
in its training of the IAWW employees.  Thus, IUSA's cross claim
against ISPA at this juncture is premature, and IUSA's motion for
summary judgment is denied without prejudice.

<u>**CONCLUSION**</u>

Based on the foregoing analysis, Defendants' motions to
exclude Dr. Ojalvo's testimony is denied as to his opinion on the
design of the Glue Spreader, and as to his opinion on the adequacy
of the warnings on the Glue Spreader.  Defendants' motions for
summary judgment are granted as to Plaintiff's manufacturing
defect and breach of express and implied warranty claims, which
are dismissed.  Defendants' motions for summary judgment are denied
as to Plaintiff's design defect and failure to warn claims.  IUSA's
motion for summary judgment on its cross claim for indemnification
is denied without prejudice.

The parties are directed to appear for a telephone conference with the undersigned on April 1, 2022 at 10:00 a.m. to advise the Court how they plan to proceed with this case, and to contact Magistrate Judge Scanlon by close of business on March 14, 2022 to arrange for a settlement conference and the completion of a Final Joint Pre-Trial Order. Judge Scanlon's schedule permitting, the parties should schedule a settlement conference before the April 1st conference with the undersigned.

SO ORDERED.

_____
/s/
Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York

Dated: Brooklyn, New York
       March 13, 2022

47